UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOAO A. SOUSA,                     :
        Plaintiff,                 :
                                   :
     v.                            :        CA 08-218 S
                                   :
MICHAEL J. ASTRUE,                 :
COMMISSIONER OF SOCIAL SECURITY, :
        Defendant.                 :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This matter is before the Court on the request of Plaintiff Joao A. Sousa ("Plaintiff") for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), under §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act").  Plaintiff has filed a motion to reverse the decision of the Commissioner.  See Plaintiff's Motion to Reverse without or, Alternatively, with a Remand for a Rehearing the Commissioner's Final Decision (Document ("Doc.") #9) ("Motion to Reverse").  Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.  See Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. #11) ("Motion to Affirm").

This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth herein, I find that the Commissioner's determination that Plaintiff is not disabled is supported by substantial evidence in the record.  Accordingly, based on the following analysis, I recommend that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to

Reverse be denied.

## Facts and Travel

Plaintiff was born in 1944, (Record ("R.") at 61, 437),[1] and was sixty-two years of age at the time of the hearing before the administrative law judge ("ALJ"), (R. at 438). He has a high school education, in Portugal and Brazil, and is illiterate in English.[2] (R. at 18, 64, 69, 416, 434) He has past relevant work experience as a concrete laborer, a waiter, a bartender, an auto parts truck driver, a machine operator, a night clerk/ stocker, and a parking lot driver. (R. at 18, 25, 65-66, 84, 435, 437-38)

Plaintiff filed applications for DIB and SSI on July 6, 2004. (R. at 18, 417) He alleged disability since November 28, 2003, (R. at 18, 61, 65), due to a myocardial infarction, back and arm pain, anxiety, depression, hypertension, and bilateral osteoarthritis of the hands, (R. at 18, 65, 417-18). The applications were denied initially, (R. at 18, 38), and on reconsideration, (R. at 18, 39, 396), and a request for a hearing before an ALJ was timely filed, (R. at 18, 36). A hearing was held on December 13, 2006, before ALJ Martha Bower at which Plaintiff, represented by counsel, appeared and testified through a Portuguese interpreter. (R. at 18, 414-16, 418-39) An impartial vocational expert also testified. (R. at 18, 414-15, 435-41) On December 22, 2006, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.

---

[1] Although the Disability Report filed on January 14, 2005, lists Plaintiff's year of birth as 1945, (R. at 61), Plaintiff's counsel noted at the hearing that Plaintiff was actually born in 1944, (R. at 437); see also (R. at 126).

[2] The ALJ noted that at the December 13, 2006, hearing, Plaintiff apparently "understood many of the questions before translation but responded in Portuguese." (R. at 25) Counsel confirmed that Plaintiff "does understand and speak a little bit of English ...." (R. at 416)

(R. at 18-26)  Plaintiff requested review by the Appeals Council, (R. at 13-14), which on April 3, 2008, denied his request, (R. at 6-9), thereby rendering the ALJ's decision the final decision of the Commissioner, (R. at 6).  Plaintiff thereafter filed this action for judicial review.

## Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

## Standard of Review

The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999). Although questions of law are reviewed *de novo*, the Commissioner's findings of fact, if supported by substantial evidence in the record,[3] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)).  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "Indeed, the

---

[3] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)); see also Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v. Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426 (1971))).

**Law**

To qualify for DIB, a claimant must meet certain insured status requirements,[4] be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act. See 42 U.S.C. § 423(a). An individual is eligible to receive SSI if he is aged, blind, or disabled and meets certain income requirements. See 42 U.S.C. § 1382(a).

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. 423(d)(1)(A). A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[5] 20 C.F.R. §§ 404.1521(a), 416.921(a)

---

[4] The ALJ found that Plaintiff "me[t] the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and [was] insured for benefits through March 31, 2004." (R. at 25) Plaintiff's date last insured is listed in the record as both March 31, 2004, (R. at 32, 49, 417), and December 31, 2003, (R. at 23, 38, 39, 61).

[5] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b) (2009). Examples of these include:

(2009).[6]  A claimant's complaints alone cannot provide a basis
for entitlement when they are not supported by medical evidence.
See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21
(1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Social Security regulations prescribe a five step
inquiry for use in determining whether a claimant is disabled.
See 20 C.F.R. § 404.1520(a) (2009); see also Bowen v. Yuckert,
482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v.
Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that
scheme, the Commissioner must determine sequentially: (1) whether
the claimant is presently engaged in substantial gainful work
activity; (2) whether he has a severe impairment; (3) whether his
impairment meets or equals one of the Commissioner's listed
impairments; (4) whether he is able to perform his past relevant
work; and (5) whether he remains capable of performing any work
within the economy.  See 20 C.F.R. § 404.1520(b)-(g).  The
evaluation may be terminated at any step.  See Seavey, 276 F.3d
at 4.  "The applicant has the burden of production and proof at
the first four steps of the process.  If the applicant has met
h[is] burden at the first four steps, the Commissioner then has

---

(1)  Physical functions such as walking, standing, sitting,
lifting, pushing, pulling, reaching, carrying, or handling;
(2)  Capacities for seeing, hearing, and speaking;
(3)  Understanding, carrying out, and remembering simple
instructions;
(4)  Use of judgment;
(5)  Responding appropriately to supervision, co-workers and
usual work situations; and
(6)  Dealing with changes in a routine work setting.

Id.

[6] The Social Security Administration ("SSA") has promulgated
identical sets of regulations governing eligibility for Disability
Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").
See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120
n.1 (1st Cir. 1986).  For simplicity, the Court hereafter will cite
only to one set of regulations.  See id.

the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

## ALJ's Decision

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability, (R. at 25); that prior to March 31, 2004, Plaintiff's date last insured for DIB, he had the medically determinable impairments of mild cervical and thoracic pain into the left upper extremity, but that he did not have any impairment or combination of impairments that significantly limited his ability to perform basic work-related activities and, therefore, did not have a severe impairment, (R. at 25-26); that subsequent to March 31, 2004, Plaintiff's myocardial infarction constituted a severe impairment, (R. at 26); that, nevertheless, it did not meet or equal an impairment listed in Part 404, Subpart P, Appendix 1, (id.); that Plaintiff's allegations regarding his limitations were not totally credible, (id.); that subsequent to March 31, 2004, Plaintiff retained the residual functional capacity ("RFC") to perform work at the medium exertional level with no repetitive overhead reaching on the non-dominant side, (id.); that subsequent to March 31, 2004, Plaintiff's myocardial infarction did not prevent him from performing his past relevant work, (id.); and that, therefore, Plaintiff was not under a disability, as defined by the Act, at any time through the date of the decision, (id.).

## Errors Claimed

Plaintiff alleges that: (1) the ALJ's step two decision that Plaintiff's emotional impairments were not severe prior to or after his date last insured of March 31, 2004, is not supported

by substantial evidence; (2) the ALJ's step two decision that Plaintiff's physical impairments were not severe prior to his date last insured of March 31, 2004, is not supported by substantial evidence; and (3) the ALJ's step four decision that Plaintiff was capable of performing his past relevant work is not supported by substantial evidence.

## Discussion

### I.   The ALJ's Step Two Decision

#### A.   Plaintiff's Alleged Emotional Impairments

As noted above, the ALJ found that prior to March 31, 2004, Plaintiff's date last insured for DIB, he did not have a severe impairment and that the only medically determinable impairment he had was mild cervical and thoracic pain into the left upper extremity. (R. at 25-26)  The ALJ also found that subsequent to March 31, 2004, the only severe impairment Plaintiff had was a myocardial infarction, (R. at 26), and that the record did not support a finding of a severe psychiatric impairment, (R. at 24). Plaintiff argues that "substantial evidence does not support the ALJ's finding that [Plaintiff] did not have a 'severe' emotional impairment prior to or after March 31, 2004."  Plaintiff's Memorandum in Support of Plaintiff's Motion to Reverse without a Remand for a Rehearing or, Alternatively, with a Remand for a Rehearing the Commissioner's Decision ("Plaintiff's Mem.") at 6.

The Court of Appeals for the First Circuit has stated that the step two severity determination is a "*de minimis* policy, designed to do no more than screen out groundless claims." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986).  A finding of "nonsevere" is only to be made where "medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work ...." Id. (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856

(S.S.A.)).  At step two, Plaintiff bears the burden of producing
evidence that he suffers from a severe medically determinable
impairment.  See Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir.
2001)("The applicant has the burden of production and proof at
the first four steps of the process."); Musto v. Halter, 135
F.Supp.2d 220, 233 (D. Mass. 2001)(noting plaintiff's burden of
proving disability and stating that plaintiff "first had to
demonstrate that he had a medically severe impairment or
combination of impairments"); see also 20 C.F.R. § 404.1512(a)
(2009) ("In general, you have to prove to us that you are blind
or disabled. ...  This means that you must furnish medical and
other evidence that we can use to reach conclusions about your
medical impairment(s) ....").

    "Once the existence of a medically determinable physical or
mental impairment(s) that could reasonably be expected to produce
the pain or other symptoms alleged has been established on the
basis of medical signs and laboratory findings, allegations about
the intensity and persistence of the symptoms must be considered
with the objective medical abnormalities, and all other evidence
in the case record, in evaluating the functionally limiting
effects of the impairment(s)."  SSR 96-4p, 1996 WL 374187, at *2
(S.S.A.)  The regulation pertaining to evaluation of mental
impairments also contemplates a two-step process:

> (1) Under the special technique, we must first evaluate
> your pertinent symptoms, signs, and laboratory findings
> to determine whether you have a medically determinable
> mental impairment(s). ...
> (2) We must then rate the degree of functional limitation
> resulting from the impairment(s) ....

20 C.F.R. § 404.1520a(b) (2009); see also Dalis v. Barnhart, No.
Civ.A. 02-10627-DPW, 2003 WL 21488526, at *7 (D. Mass. June 24,
2003)(noting that "because there is insufficient medical evidence
of a mental impairment on the record, the ALJ could not proceed

8

beyond the first step in evaluating mental impairments ...").

The evidence pertaining to Plaintiff's alleged emotional impairments is sparse, consisting of a report of one psychiatric consultative examination by Paul Fulton, D.O., (R. at 177-81), two Psychiatric Review Technique forms and accompanying MA DDS Medical Evaluation Sheets completed by non-examining sources, (R. at 182-97, 293-307), and Plaintiff's comments to and statements by treating sources, (R. at 236, 265, 370). The ALJ summarized this evidence as follows:

> Rhode Island Hospital emergency department observed November 28, 2003, he was oriented with a normal mood and affect. On April 20, 2004, he completed a form for [Gregory DeCrescenzo, D.C.,] denying increased nervousness or irritability. [Robert Ludwig, M.D.,] noted June 7, 2004, the claimant was alert and oriented. A July 29, 2004, form by Dr. DeCrescenzo marked "N/A" to mental deficits. Rhode Island Hospital noted August 16, 2004, that the claimant's mood was "OK." An April 13, 2005, consultative examination by Dr. Fulton revealed the claimant cited depression, fatigue, decreased interest and concentration, anhedonia, insomnia with multiple wakings, psychomotor retardation, extreme forgetfulness, occasional suicidal ideation without a plan, anxiety, worries, panic attacks once a week, and social avoidance. The claimant stated he took Valium for sleep since a 2003 motor vehicle accident. He denied any psychiatric hospitalizations or counseling, any history of physical or sexual abuse or learning problems. He ceased work after a 2004 motor vehicle accident left him feeling he could no longer work. His wife did the cooking, cleaning, shopping, and bill paying and he received rides from his wife or a friend; did not know how to use a bus but could take a taxi; watched television and stayed inside; was close to his wife, children, and grandchildren; and had casual relationships with a few friends. Dr. Fulton diagnosed a severe recurrent major depressive disorder, a generalized anxiety disorder, a panic disorder with agoraphobia, and partner relational problems with a Global Assessment [of] Functioning of

41.[7]  He felt the claimant's condition was inadequately treated as he was not in therapy and took only Valium. He opined the claimant's condition would significantly improve with treatment. [Steven Weinsier, M.D.,] observed May 18, 2005, the claimant had some depression and stress from being out of work for a year.  An August 1, 2005, form by [Andrew Levinson, M.D.,] indicated the claimant had no psychiatric diagnosis.  The claimant was attentive to personal appearance; got along adequately with others; could deal with routine stress; could travel independently in public; had no decrease in habits, interests, relationships or daily activities; and had no deficits in concentration, memory or attention.  An August 17, 2005, Report of Contact with Dr. Levinson noted he had treated the claimant since October of 2004 and he had never mentioned psychiatric problems. University Medical Group indicated July 12, 2006, the claimant stated he had felt forgetful for months and he expressed vague depression.

(R. at 22-23)(internal citations omitted).  The ALJ further noted that:

Non-examining sources at the initial determination level assessed a mild impairment in social functioning and a marked impairment in activities of daily living and concentration, persistence or pace due to anxiety and depression with insufficient evidence to find the claimant disabled prior to December of 2003.[8]  Non-examining sources at the reconsideration determination level ... found insufficient evidence to assess a psychiatric impairment prior to the date last insured of

---

[7] The Global Assessment of Functioning ("GAF") "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'"  Langley v. Barnhart, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004)(quoting Diagnostic and Statistical Manual of Mental Disorders - Text Revision (4th ed. 2000) ("DSM-IV-TR") at 32).  The GAF "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DSM-IV-TR at 34.  A GAF between 41-50 is indicative of "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).

[8] See n.4.

December 31, 2003, and there was no medically
determinable psychiatric impairment after that date.

(R. at 23)   The ALJ evaluated this evidence and found that:

After the date last insured expired ... [Plaintiff] cited
numerous psychiatric symptoms to the consultative
examiner yet the rest of the record does not support his
presentation especially in light of a July 19, 2005, case
development sheet wherein his wife stated he was not
depressed and never had been. Thus, Dr. Fulton's report
is given limited weight as it was based on the claimant's
subjective statements, which are not considered credible.
This finding is supported by the claimant denying
increased nervousness or irritability to Dr. DeCrescenzo;
Dr. DeCrescenzo marking "N/A" to mental deficits; and Dr.
Weinsier only finding some depression and stress from
being out of work. Further, the claimant never had a
psychiatric hospitalization or counseling and no source
suggested counseling. He stated his wife took care of
things and he did not drive but he had friends, had good
family relations, could use a taxi, watched television,
and could coordinate rides with his wife or friends.
Yet, the Administrative Law Judge notes the claimant
completed a heart questionnaire indicating he could do
dishes, drive, mind his grandchildren, do light household
repairs, watch television, and keyboard. Further, a
Function Report revealed he went for walks, did self-care
without assistance, watched television, did light
household chores, managed finances, drove, shopped, and
socialized with friends and family. It is significant
the claimant described himself as "retired" rather than
disabled. His treating physician, Dr. Levinson, stated
the claimant had no psychiatric diagnosis and no issues
with self-care, getting along with others, dealing with
routine stress or traveling independently as well as no
decrease in habits, interests, relationships or daily
activities and no deficits in concentration, memory or
attention. Thus, except for the consultative
examination, the record does not support a severe
psychiatric impairment and as the claimant's presentation
to Dr. Fulton was vastly different than that to treating
sources, the report is given limited weight. At the
hearing, the claimant was pleasant, attended well, and
understood many of the questions before translation but
responded in Portuguese. In fact, he was cheerful and
laughing. He is not entirely credible based on
inconsistencies in the record including his testimony

11

regarding driving.

(R. at 24-25)

Plaintiff argues that the "State agency's own non-examining physician, Kathryn Collins-Wooley, Ph.D., found that [Plaintiff] suffered from not only a severe, but *disabling* psychiatric impairment.  Specifically, Dr. Collins-Wooley opined that [Plaintiff's] condition met the criteria of Social Security Listing 12.06, Anxiety Disorders."  Plaintiff's Mem. at 9 (citing R. at 182).  Plaintiff alleges that "[t]he ALJ's decision mentions this expert opinion but fails to evaluate it, and fails to follow it."[9]  Id.

The evidence on which Dr. Collins-Wooley relied was a report from Belarmino A. Nunes, M.D., whom she described as Plaintiff's primary care physician for over five years, and the report of Dr. Fulton's consultative examination.  (R. at 196)  Dr. Collins-Wooley described the evidence from Dr. Nunes as indicating "anxiety [and] depression, hypochondriasis ...," (id.), and noted that Dr. Nunes prescribed Lexapro, Seroquel, Xanax, and Effexor. However, the record contains a letter from Dr. Nunes dated February 4, 2005, in which he states that: "[Plaintiff] consulted me on one occasion in December 2003.  At that time he had been involved in an automobile accident.  He did not consult me further and I am unaware of his present condition."  (R. at 274) Plaintiff concedes that the medical records from Dr. Nunes regarding treatment for psychiatric issues and prescriptions for psychotropic medications were for "the wrong patient[,]" Plaintiff's Response to Defendant's Motion to Affirm the Decision of the Commissioner of the Social Security Administration

---

[9] The ALJ was not required to follow Dr. Collins-Wooley's opinion.  See SSR 96-6p, 1996 WL 374180, at *2 (S.S.A.) ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists ....").

("Plaintiff's Response") at 2; see also (R. at 305), not
Plaintiff.  This fact alone undermines Dr. Collins-Wooley's
assessment.  Moreover, the erroneous records appear to have
colored her evaluation of Dr. Fulton's report.  Dr. Collins-
Wooley stated that: "[t]here is some discrepancy between
[Plaintiff's] wife's report and his presentation at the psych.
exam but the psych exam is consistent with the long term (5
years) primary care provider's impression of severe limitations
in energy and concentration and very limited stress tolerance."
(R. at 196)  Accordingly, the Court finds that the ALJ was
justified in giving little or no weight to Dr. Collins-Wooley's
opinion that Plaintiff met Listing 12.06.

Plaintiff further argues that the state agency's examining
physician, Dr. Fulton, found a more-than-minimal psychiatric
impairment, Plaintiff's Mem. at 9, and that "[t]he ALJ
incorrectly gave limited weight to the psychiatric evaluation,
performed by DDS examiner, Dr. Paul Fulton," id. at 10.  However,
Dr. Fulton also received the incorrect records from Dr. Nunes.[10]
(R. at 177)  According to Dr. Fulton: "Records available for
review include a typed letter signed by a [B]elarmino A. Nunes,
M.D.[,] in which Dr. Nunes indicates that the patient has a long-
standing history of anxiety and depression and hypertension and
panic disorder and hypochondriasis and notes that [Plaintiff] is
incapable of any gainful employment."  (Id.)  Dr. Fulton's
diagnoses are strikingly similar to those reported in the
erroneous record(s) from Dr. Nunes: major depressive disorder,
recurrent, severe without psychotic features, generalized anxiety

_____

[10] The only other record available for Dr. Fulton's review was "a
disability report adult form SSA3368 typed and dated Friday March 11,
2005[,] which is to indicate the pain the patient suffers was pain
[sic], can't work[,] has had a heart attack, and lists a number of
medications and indicates that he completed the twelfth grade."  (R.
at 177)

disorder, panic disorder with agoraphobia, rule out
hypochondriasis, and rule out borderline intellectual
functioning.  (R. at 181)

Plaintiff contends that Dr. Fulton "relied upon objective
medical evidence from his mental status examination," Plaintiff's
Mem. at 10, and that the ALJ's explanation for giving limited
weight to his opinion, that "it was based on the claimant's
subjective statements, which are not considered credible," (R. at
24); see also Plaintiff's Mem. at 10, is incorrect.  However, it
is impossible to ascertain to what degree the erroneous
information from Dr. Nunes colored Dr. Fulton's assessment.
Further, the ALJ's credibility finding is generally entitled to
deference.  See Frustaglia v. Sec'y of Health & Human Servs., 829
F.2d 192, 195 (1st Cir. 1987)("The credibility determination by
the ALJ, who observed the claimant, evaluated his demeanor, and
considered how that testimony fit in with the rest of the
evidence, is entitled to deference, especially when supported by
specific findings.")(citing DaRosa v. Sec'y of Health & Human
Servs., 803 F.2d 24, 26 (1st Cir. 1986)); see also Yongo v. INS,
355 F.3d 27, 32 (1st Cir. 2004)("[T]he ALJ, like any fact-finder
who hears the witnesses, gets a lot of deference on credibility
judgments."); Suarez v. Sec'y of Health & Human Servs., 740 F.2d
1 (1st Cir. 1984)(stating that ALJ is "empowered to make
credibility determinations ...").

Moreover, Dr. Fulton's opinion is not uncontroverted.  Jane
Marks, M.D., reviewed the evidence of record, including the
assessments from Drs. Collins-Wooley and Fulton, and concluded
that there was insufficient evidence of a psychiatric impairment
prior to Plaintiff's date last insured and that there was no
medically determinable mental impairment subsequent to that date.
(R. at 293)  Dr. Marks indicated that there was no psychiatric
medical evidence of record pertaining to psychiatric issues

14

except for the consultative examination by Dr. Fulton.  (R. at
305)  She further stated that at the initial determination level
it was noted that there was insufficient evidence prior to
Plaintiff's date last insured with reference to his DIB claim,
but that regarding his SSI claim Plaintiff

> was also given a "meets 12.06" based on [consultative
> examination] and report from [primary care physician] Dr.
> Nune[s] (a discrepancy was noted between wife's
> [activities of daily living] report and presentation at
> [consultative examination]).
> In reviewing the [medical evidence of record], the report
> from Dr. Nune[s] was not on this claimant but on someone
> with a similar name.  In fact Dr. Nune[s] sent in another
> letter stating he saw cl[aimant] [once] 12/03 after a
> [motor vehicle accident].
> For recon ... cl[aimant's] [primary care physician], Dr.
> Levinson[,] sent in a report stating cl[aimant] has no
> psych. problems.  This was confirmed on [Report of
> Contact] with Dr. L[evinson].  [Report of Contact] with
> cl[aimant's] wife on 7/19/05 notes that she says
> cl[aimant] is not, and was not, depressed.  There is no
> evidence in other [medical evidence of record] that
> cl[aimant] has a psych. problem.
> Based on above, there is insuff[icient] psych. evidence
> for [date last insured] and no psych. [diagnosis] for
> [SSI].
> There are credibility issues around presentation at
> [consultative examination] as this is inconsistent with
> other reports/evidence.[11]

(Id.)  Dr. Marks' Report of Contact of August 17, 2005, with Dr.

---

[11] Plaintiff's statements to Dr. Fulton about the amount and
frequency of his use of alcohol illustrate such inconsistency.
Plaintiff told Dr. Fulton on April 12, 2005, that "since his heart
attack [in May 2004] he has only had one glass of wine a week," (R. at
178), and that "[p]rior to the heart attack, he would drink on the
weekends each day, a half-bottle of wine and two beers ...," (id.).
However, Plaintiff told Rhode Island Hospital personnel on June 7,
2004, that he "usually has 2-3 glasses of wine per day," (R. at 259),
and on January 6, 2005, (only three months prior to Dr. Fulton's
evaluation) that he "drinks occasional wine four to five times a week,
no more than two glasses," (R. at 253).  A February 12, 2006, report
from the University Medical Group indicates that Plaintiff consumes
less than "2 glasses [of] wine d[aily]."  (R. at 370)

Levinson states that she

> [s]poke with Dr. Levinson regarding his report that
> cl[aimant] has no psych. [diagnosis] or problems.  He is
> his [primary care physician] and has seen him from 10/04-
> 7/5/05. ...  No evidence for any significant anxiety or
> depression.  Never mentioned any psych. problems to
> Doctor L[evinson].  Does not appear nervous or depressed.
> Cognitive functioning appears intact.

(R. at 236)

Although the ALJ does not mention Dr. Marks by name, she
stated that "non-examining sources [at the reconsideration level]
... found insufficient evidence to assess a psychiatric
impairment prior to the date last insured of December 31, 2003,
and there was no medically determinable psychiatric impairment
after that date."  (R. at 23)  The ALJ noted, among other
reasons, that the medical evidence of record did not support
Plaintiff's presentation to Dr. Fulton and allegations of
numerous psychiatric symptoms; that Plaintiff's wife stated that
[Plaintiff] was not depressed and never had been; and that Dr.
Levinson stated that Plaintiff had no psychiatric diagnosis, all
of which are reflected in Dr. Marks' assessment.[12]  (R. at 24,

------

[12] While it is true that the ALJ should have stated the weight
given to Dr. Marks' and Dr. Collins-Wooley's assessments and the
reasons therefor, the Court finds it clear from her decision that she
credited the former and discounted the latter.  Therefore, remand for
the purpose of having the ALJ state the weight accorded to the two
opinions would amount to no more than an "empty exercise."  Dantran,
Inc. v. U.S. Dep't of Labor, 171 F.3d 58, 73 (1st Cir. 1999)("[W]hen a
reviewing court discovers a serious infirmity in agency decision-
making, the ordinary course is to remand.  But such a course is not
essential if remand will amount to no more than an empty exercise.")
(internal citations omitted); see also Fisher v. Bowen, 869 F.2d 1055,
1057 (7th Cir. 1989)("No principle of administrative law or common
sense requires us to remand a case in quest of a perfect opinion
unless there is reason to believe that the remand might lead to a
different result."); Lord v. Apfel, 114 F.Supp.2d 3, 13 (D.N.H.
2000)("[W]e see no reason to return this case for the purely formulaic
purpose of having the ALJ write out what seems plain on a review of
the record.")(quoting Shaw v. Sec'y of Health & Human Servs., 25 F.3d

305)  It is the ALJ's responsibility to resolve conflicts in the evidence.  See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("[T]he resolution of conflicts in the evidence is for the [Commissioner], not for the courts."); Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987)("Conflicts in the evidence are, assuredly, for the [Commissioner]--rather than the courts--to resolve.").

     In addition, the other reasons given by the ALJ for affording limited weight to Dr. Fulton's opinion are valid.  For example, the ALJ noted Plaintiff had never been hospitalized for psychiatric issues or received counseling.  (R. at 24)  Lack of treatment is a factor which the ALJ may consider.  See Irlanda Ortiz, 955 F.2d at 770 ("[A]side from the five therapy sessions the claimant attended ... there is no record of any other mental health therapy during his insured status.  As a result, there is no way of telling whether psychiatric treatment could have improved these 'marked' limitations.").[13]  In her summary of the medical evidence regarding Plaintiff's allegations of psychiatric issues, the ALJ noted that Dr. Levinson reported that Plaintiff had never mentioned psychiatric problems in the ten months during which the doctor had treated Plaintiff.  (R. at 23); see also Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 4 (1st Cir. 1987)(finding absence of affirmative mention of nervous condition by doctor or of subjective complaints by plaintiff to be significant relative to finding that impairment was non-severe).  The ALJ also properly focused on Plaintiff's daily activities.  See Avery v. Sec'y of Health & Human Servs., 797

---

1037, 1994 WL 251000, at *5 (1st Cir. June 9, 1994)(per curiam; table decision, text available on Westlaw)).

     [13] Indeed, Dr. Fulton suggested that "with optimal treatment, I would expect [Plaintiff] to likely achieve significant improvement in psychosocial or vocational functioning."  (R. at 181)

F.2d 19, 28-29 (1st Cir. 1986); <u>see also</u> 20 C.F.R. §
404.1529(c)(3) (2009) (including daily activities among factors
relevant to symptoms, such as pain, to be considered); SSR 96-7p,
1996 WL 374186, at *3 (S.S.A.)(same).  The Court, therefore,
finds no reason to fault the ALJ's determination to accord
limited weight to Dr. Fulton's assessment.[14]

Plaintiff's final argument with regard to Plaintiff's
alleged mental impairments is that the ALJ erroneously failed to
consult a psychiatric or psychological medical expert to make a
determination as to the onset of Plaintiff's depression and
anxiety.  Plaintiff's Mem. at 10-11.  While the Court of Appeals
for the First Circuit has stated that the ALJ has a duty to
develop the record in some circumstances, <u>see, e.g.</u>, <u>Heggarty v.
Sullivan</u>, 947 F.2d 990, 997 (1st Cir. 1991), this is not one of
those circumstances.  This Court has previously held that "once a
disability has been identified, a medical advisor may be
necessary to assist an ALJ in determining the onset date of that
disability when the onset date is relevant to a claimant's
entitlement to benefits."  <u>Lisi v. Apfel</u>, 111 F.Supp.2d 103, 111
(D.R.I. 2000)(citing SSR 83-20, 1983 WL 31249 (S.S.A.)).  Here,
however, as was the case in <u>Lisi</u>, "the ALJ found that [P]laintiff
was not under a disability; therefore, no analysis of an onset
date was necessary."  <u>Id.</u>

The Court finds that the ALJ's determination that Plaintiff
did not suffer from a severe mental impairment either before or
after his date last insured is supported by substantial evidence

---

[14] Plaintiff argues that the ALJ should have accorded Dr. Fulton's
opinion controlling weight.  <u>See</u> Plaintiff's Response at 3.  However,
controlling weight may only be given to opinions from treating
sources.  <u>See</u> SSR 96-2p, 1996 WL 374188, at *2 (S.S.A.)(noting that in
order to be given controlling weight, "[t]he opinion must come from a
'treating source.'").  Dr. Fulton was not a treating source, but,
rather, performed a consultative examination.  (R. at 177)

in the record.  Therefore, I do not recommend remand on this
issue.

**B.   Plaintiff's Alleged Physical Impairments**

The ALJ found that prior to his date last insured, Plaintiff
had the medically determinable impairments of mild cervical and
thoracic pain into the left upper extremity, (R. at 25), that
there was no evidence of an impairment lasting twelve months
before expiration of Plaintiff's insured status on March 31,
2004, (id.), and that prior to March 31, 2004, Plaintiff did not
have an impairment or impairments that significantly limited his
ability to perform basic work-related activities and, therefore,
did not have a severe impairment, (R. at 26).  Plaintiff argues
that substantial evidence does not support the ALJ's finding that
he did not have a severe physical impairment prior to that
date.[15]

The ALJ first summarized the evidence pertaining to
Plaintiff's orthopedic issues:

> The claimant reported orthopedic issues.  A November 28,
> 2003, Plainville Incident Report revealed the claimant
> was in a motor vehicle accident with resulting chest and
> back pain.  He moved the lower extremities without
> difficulty and had pain with movement of the upper left
> extremity.  Rhode Island Hospital emergency department
> indicated November 29, 2003, the claimant had chest and
> left shoulder pain from an accident.  He had no back or
> hip tenderness, a stable pelvis, no pedal edema, and a
> normal neurologic examination with negative cervical,
> chest, and left shoulder x-rays.  He was diagnosed with
> a left shoulder and left rib/chest contusion.  Belarmino
> Nunes, M.D., noted December 4, 2003, the claimant stated
> he was in a car accident that resulted in pain in the
> shoulders, rib cage, legs, and low back.  The claimant
> had a normal neck and neurologic examination.  Gregory

_____

[15] The Court addresses only Plaintiff's complaints of back and arm
pain because his myocardial infarction, hypertension, and diagnoses of
mild airway obstruction and bilateral osteoarthritis of the hands all
post-date March 31, 2004.  (R. at 19-20, 21-22)

19

DeCrescenzo, D.C., stated December 10, 2003, the claimant cited severe neck pain with headaches, severe mid- and low back pain into the left leg with numbness to the foot, and severe left anterior rib pain.  He opined the claimant was disabled by a severe sprain-strain syndrome of the cervical, thoracic, and lumbar spine; intersegmental dysfunction of the cervical, thoracic, and lumbar spine; an intercostal sprain-strain; headaches; and lumbar radiculitis.  X-rays revealed no thoracic spine or left rib fracture and mild degenerative changes of the thoracic spine and the right first costochondral junction. Dr. DeCrescenzo reported February 3, 2004, the claimant cited intermittent left neck, rib, and left arm pain to the elbow.  An examination revealed mildly decreased cervical and lumbar range of motion and intact sensation and motor.  On March 11, 2004, the claimant had mildly diminished cervical and lumbar range of motion, intact motor and sensation, and mild spasms.   Dr. DeCrescenzo stated March 18, 2004, the claimant had moderate to severe neck, low back, leg, and shoulder pain that preclude[d] work until April 2, 2004.  An MRI on March 22, 2004, revealed mild C5-6 central stenosis and marked left and moderate right foraminal narrowing.  On April 16, 2004, Dr. DeCrescenzo opined the claimant could return to work on April 19, 2004, with no work restrictions.  The claimant completed a form indicating he had no pain or numbness, no discomfort on prolonged sitting or standing, and no headaches.

Dr. DeCrescenzo noted April 22, 2004, the claimant had no subjective complaints with normal cervical and lumbar range of motion, a negative motor and sensory examination, intact deep tendon reflexes, no left shoulder issues, and no spasm.  The claimant was released from care to return to work with a 100 percent improvement in symptoms. Dr. DeCrescenzo reported May 5, 2004, the claimant was last seen on April 20, 2004, and was unable to work due to orthopedic issues from November 28, 2003, until he was released for work on April 19, 2004.  He stated at the last examination the claimant had no subjective complaints and no objective findings to support care.  On May 20, 2004, Dr. DeCrescenzo reported the claimant stated he was in a motor vehicle accident on April 28, 2004, that resulted in neck pain into the shoulders and arms with headaches as well as mid- and low back pain.  He diagnosed a traumatic sprain-strain syndrome of the cervical, thoracic, and lumbar spine; an intersegmental dysfunction of the cervical, thoracic, and

lumbar spine; headaches; and cervical and lumbar
radiculitis. He opined the claimant was unable to work.
Dr. DeCrescenzo completed a form on July 29, 2004,
indicating the claimant had a cervical sprain/strain with
radiculitis since April 28, 2004, preclud[ing] walking,
standing, sitting, reaching, stooping, lifting/carrying
or bending. He noted the claimant was recovering from a
heart attack and would return to treatment when his
strength returned and he could make his appointments. Dr.
Levinson stated October 21, 2004, the claimant had good
extremities range of motion. On December 8, 2004, the
claimant could ambulate without difficulty and no
complaints. On March 3, 2005, Dr. DeCrescenzo diagnosed
a cervical disc protrusion at C2-6 with foraminal
narrowing from C3-6 with diminished cervical and lumbar
range of motion, pain, and muscle spasms as well as
bilateral arm pain. He stated he treated the claimant
from December 9, 2003, until May 27, 2004, and felt the
claimant was disabled as of May 27, 2004, and unable to
perform his work duties. A June 7, 2004, examination by
Dr. Ludwig revealed full extremities range of motion with
no focal neurologic deficits. Dr. Nunes stated February
4, 2004, the claimant did not return after an initial
consultation in 2003.

(R. at 20-21)(internal citations omitted). The ALJ then stated
that:

While the Administrative Law Judge finds the claimant has
impairments, the record does not support the degree of
limitation alleged. ... Non-examining sources at the
reconsideration determination level stated the claimant
could perform medium exertion with no work above the
shoulder level on the left and a second assessment noted
the claimant could do medium exertion with occasional
stooping. ... The claimant alleged severe pain from
orthopedic issues after two motor vehicle accidents. He
underwent chiropractic therapy for neck, back, left
shoulder, and leg pain and the chiropractor, Dr.
DeCrescenzo, opined the claimant was disabled from
November 28, 2003, until April 19, 2004, then again after
an April 28, 2004, accident yet his examinations revealed
mild findings. Further, the claimant stated his symptoms
were intermittent and he used no handheld assistive
device. It is noted that Dr. Levinson indicated the
claimant had no orthopedic diagnosis and had never
reported orthopedic issues until July of 2005 when he had

21

a normal examination. ...  It is significant that the
claimant failed to return to Dr. Nunes after his
examination revealed normal findings and instead
presented to a chiropractor.  Dr. DeCrescenzo's opinion
is given limited weight as it is inconsistent with those
of medical sources, a chiropractor is not a medically
acceptable source, and his assessment of severe pain is
not supported by the claimant taking only over-the-
counter ibuprofen or Tylenol.  Further, despite not
having seen or treated the claimant since May of 2004, he
opined the claimant was disabled.  Thus, the
Administrative Law Judge finds the claimant has no
medically acceptable evidence to support a severe
orthopedic impairment for twelve months.  This finding is
consistent with the unremarkable examinations and mild
findings on radiology reports as well as the claimant's
failure to report orthopedic issues or pain to Dr.
Levinson, his treating physician, until July of 2005.
Further, no source recommended epidural steroid
injections or surgery.

(R. at 23-24)(internal citations omitted).

Plaintiff does not challenge the ALJ's assessment of the
medical evidence.  Rather, Plaintiff argues that the ALJ's
evaluation of Plaintiff's activities of daily living is not
supported by substantial evidence and is factually erroneous.
See Plaintiff's Mem. at 12-15.

An ALJ is required to investigate "all avenues presented
that relate to subjective complaints ...."  Avery, 797 F.2d at
28.  In addition, "whenever the individual's statements about the
intensity, persistence, or functionally limiting effects of pain
or other symptoms are not substantiated by objective medical
evidence, the adjudicator must make a finding on the credibility
of the individual's statements based on a consideration of the
entire case record."  SSR 96-7p, 1996 WL 374186, at *2.  When
assessing the credibility of an individual's statements, the ALJ
must consider, in addition to the objective medical evidence, the
following factors:

1.   The individual's daily activities;

2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; see also Avery, 797 F.2d at 29 (listing factors relating to symptoms, such as pain, to be considered); 20 C.F.R. § 404.1529(c)(3) (2009) (same). As noted previously, the ALJ's credibility finding is generally entitled to deference, especially when supported by specific findings. Frustaglia, 829 F.2d at 195; see also Yongo, 355 F.3d at 32; Suarez, 740 F.2d at 1.

Regarding Plaintiff's daily activities, the ALJ wrote that:

[Plaintiff] stated his wife took care of things and he did not drive but he had friends, had good family relations, could use a taxi, watched television, and could coordinate rides with his wife or friends. Yet, the Administrative Law Judge notes the claimant completed a heart questionnaire indicating he could do dishes, drive, mind his grandchildren, do light household repairs, watch television, and keyboard. Further, a Function Report revealed he went for walks, did self-care without assistance, watched television, did light household chores, managed finances, drove, shopped, and socialized with friends and family.

(R. at 24) Plaintiff argues that "the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping,

23

driving a car, or limited walking for exercise does not in any way detract from h[is] credibility as to h[is] overall disability." Plaintiff's Mem. at 12 (quoting Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004)). Plaintiff focuses specifically on the ALJ's statements regarding Plaintiff's ability to drive, do housework, and perform self-care. See id. at 14-15.

First, the activities the ALJ cited are, in fact, reported in the questionnaires Plaintiff completed. For example, in the heart questionnaire, when asked if he drove Plaintiff responded affirmatively and indicated that he drove, alone, for 3-5 miles. (R. at 76) In addition, in a Questionnaire on Pain, Plaintiff listed driving among his daily activities, which also included walking and socializing. (R. at 72) Plaintiff also responded affirmatively to a question pertaining to whether he performed housework or odd jobs around the house. (R. at 74) Plaintiff explained that he "[didn't] like to be lazy and ... also like[d] to help out around the house[.]" (Id.) In reply to an inquiry about what chores he performed, Plaintiff stated that he sometimes washed dishes, minded his grandchildren, and did light household repairs. (Id.) He also said that he could "no longer do some chores due to numbness and lack of breath," (id.), due to "sharp pains in [his] neck and arms," (id.). On a function report dated July 28, 2005, Plaintiff wrote "[d]oes not apply" when asked to explain how his illnesses, injuries, or conditions affected his ability to dress, bathe, care for his hair, shave, feed himself, and use the toilet. (R. at 101) He also indicated that he did not need reminders to take care of his personal needs and grooming. (R. at 102) Thus, there is support in the record for the ALJ's statements. While Plaintiff points to other statements or testimony which differ from those referenced by the ALJ, the Court again notes that it is the ALJ's responsibility to

24

resolve conflicts in the evidence.   See Irlanda Ortiz, 955 F.2d at 769; Evangelista, 826 F.2d at 141.

Second, the ALJ did not rely exclusively on Plaintiff's activities of daily living in finding his physical impairment non-severe at step two.  She gave other reasons, (R. at 24), which are supported by substantial evidence.  For example, Dr. Levinson indicated on August 1, 2005, that Plaintiff had no diagnosis regarding disc disease, that Plaintiff mentioned lower back pain for the first time on July 5, 2005, during his sixth visit to Dr. Levinson, that Plaintiff had been treated elsewhere for his alleged back pain and no testing for such pain was done by Dr. Levinson, that Plaintiff's examination was normal, and that Dr. Levinson started a trial of ibuprofen on July 5, 2005, and referred Plaintiff for physical therapy.  (R. at 241, 251-52) As the ALJ noted, (R. at 24), while Dr. DeCrescenzo on March 3, 2005, found Plaintiff to be "fully disabled and unable to perform his work duties," (R. at 202), as of May 27, 2004, (id.), on March 3, 2005, Dr. DeCrescenzo stated that Plaintiff was "not under my care at this time," (R. at 231), and that he had last examined Plaintiff on May 27, 2004, (id.).  Further, on July 29, 2004, Dr. DeCrescenzo completed forms in which he indicated that Plaintiff's prognosis was "fair to guarded," (R. at 200), that his condition was expected to last four to six months, (R. at 201), and that the impairment was not expected to last for twelve months or result in death, (R. at 200).  The ALJ also observed that Plaintiff had been treated conservatively.  (R. at 26) Thus, the ALJ was justified in according Dr. DeCrescenzo's opinion that Plaintiff was disabled limited weight because it was both inconsistent with and unsupported by other evidence in the

record.[16]

Based on the foregoing, the Court finds the ALJ's
determination that Plaintiff did not suffer from a severe
physical impairment prior to his date last insured to be
supported by substantial evidence in the record.  Accordingly, I
do not recommend remand on this issue.

## II.    The ALJ's Step Four Decision

The ALJ found that Plaintiff retained the RFC for medium
work with no repetitive overhead reaching on the non-dominant
left side.  (R. at 25, 26)  Plaintiff contends that substantial
evidence does not support the ALJ's step four decision.
Plaintiff's Mem. at 15.

In finding that a claimant has the capacity to perform a
past relevant job, the ALJ's decision must contain the following
specific findings of fact:

1.    A finding of fact as to the individual's RFC.
2.    A finding of fact as to the physical and mental
      demands of the past job/occupation.
3.    A finding of fact that the individual's RFC would

---

[16] The ALJ correctly stated that, as a chiropractor, Dr.
DeCrescenzo is not an "acceptable medical source."  20 C.F.R. §
404.1513(a) (listing acceptable medical sources as licensed physicians
(medical or osteopathic), licensed or certified psychologists,
licensed optometrists, licenced podiatrists, and qualified speech-
language pathologists).  "Other sources" include "[medical sources not
listed in paragraph (a) of this section (for example, ...
chiropractors ...)."  20 C.F.R. § 1513(d)(1).

Moreover, the ALJ was not required to accept Dr. DeCrescenzo's
opinion that Plaintiff was "fully disabled," (R. at 202), because the
issue of disability is reserved to the Commissioner, 20 C.F.R. §
404.1527(e)(1) ("We are responsible for making the determination or
decision about whether you meet the statutory definition of
disability.  ...  A statement by a medical source that you are
'disabled' or 'unable to work' does not mean that we will determine
that you are disabled."); see also Rodriguez v. Sec'y of Health &
Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he ...
determination of the ultimate question of disability is for [the
Commissioner], not for the doctors or for the courts."); SSR 96-5p,
1996 WL 374183, at *2 (S.S.A.).

permit a return to his or her past job or
occupation.

SSR 82-62, 1982 WL 31386, at *4 (S.S.A.).  A claimant will be
found to be "not disabled" when it is determined that he or she
retains the RFC to perform:

1. The actual functional demands and job duties of a
   particular past relevant job; *or*
2. The functional demands and job duties of the
   occupation as generally required by employers
   throughout the national economy.

SSR 82-61, 1982 WL 31387, at *2 (S.S.A.).  At step four, the
burden is on the claimant to show that he can no longer perform
his former work because of his impairments.  <u>Manso-Pizarro v.
Sec'y of Health & Human Servs.</u>, 76 F.3d 15, 17 (1st Cir. 1996);
<u>cf.</u> <u>Gray v. Heckler</u>, 760 F.2d 369, 372 (1st Cir. 1985)("[A]
claimant does not make a prima facie showing of disability merely
by establishing that she cannot return to a particular prior job.
Rather, the claimant must establish an inability to return to her
former type of work."); <u>accord</u> <u>Andrade v. Sec'y of Health & Human
Servs.</u>, 985 F.2d 1045, 1051 (10th Cir. 1993)(holding that a
"claimant bears the burden of proving his inability to return to
his particular former job and to his former occupation as that
occupation is generally performed throughout the national
economy").  That burden includes an obligation to produce
relevant evidence of the physical and mental demands of
Plaintiff's prior work, <u>see</u> <u>Santiago v. Sec'y of Health & Human
Servs.</u>, 944 F.2d 1, 5 (1st Cir. 1991); <u>Gray</u>, 760 F.2d at 372, and
to "point out (unless obvious)--so as to put in issue--how his]
functional incapacity renders him] unable to perform his] former
usual work," <u>Santiago</u>, 944 F.2d at 5.

Here, the ALJ made a specific finding of fact as to
Plaintiff's RFC, namely that he could perform work at the medium
exertional level with no repetitive overhead reaching on the left

27

side.  (R. at 25, 26)  She further found that:

> The evidence in this case establishes that the claimant
> has past relevant unskilled work as a concrete laborer
> (heavy exertion), a waiter (light exertion), a bartender
> (light exertion), an auto parts truck driver (heavy
> exertion), a machine operator (heavy exertion as
> performed and light exertion according to the Dictionary
> of Occupational Titles ["DOT"]), a night clerk/stocker
> (medium exertion), and a parking lot driver (light
> exertion).

(R. at 25)  The ALJ then stated that:

> The impartial vocational expert testified that based upon
> the claimant's residual functional capacity, the claimant
> could return to his past relevant work as a parking lot
> driver, a waiter, a bartender, and a night clerk as
> previously performed and as generally performed in the
> national economy.  The Administrative Law Judge finds the
> impartial vocational expert's testimony is consistent
> with the evidence of record including the claimant's
> reported activities in the record.

(Id.)  Accordingly, the ALJ found that "[subsequent to March 31,
2004, the claimant's past relevant work as a parking lot driver,
a waiter, a bartender, and a night clerk did not require the
performance of work-related activities precluded by his residual
functional capacity."  (R. at 26)  Based on the foregoing, it is
apparent that the ALJ complied with the requirements of SSR 82-
62.  See 1982 WL 31386, at *4.

Plaintiff makes two points in support of his contention that
the ALJ's step four decision is not supported by substantial
evidence.  First, Plaintiff argues that substantial evidence does
not support a finding that Plaintiff can perform frequent or
occasional overhead reaching on the left side.  See id. at 16.
Plaintiff observes that "[t]he State Agency's own Non-Examining
physician, J.A. Jones, M.D., found that [Plaintiff] was 'unable
to work above shoulder level on the left.'"  Plaintiff's Mem. at
15 (citing (R. at 278)).  According to Plaintiff, "the non-

examining physician found the inability to perform any work above
shoulder level on the left side consistent with the treating/
examining source conclusions about the claimant's limitations or
restrictions." Id. at 15-16 (citing (R. at 281)).

Dr. Jones completed two Physical Residual Functional
Capacity Assessments. (R. at 275-82, 284-91) The first, dated
August 5, 2005, contains, under the category of "manipulative
limitations," the notation which Plaintiff references, that
Plaintiff was "[unable to work above shoulder level on the left."
(R. at 278) The second, dated August 10, 2005, includes no
manipulative limitations. (R. at 287) In fact, Dr. Jones
checked the box indicating "none established" in the category of
manipulative limitations. (Id.) Thus, Dr. Jones' reports are
inconsistent, a fact which the ALJ appears to have recognized,
(R. at 23). No source other than Dr. Jones in his first report
indicated that Plaintiff could not perform any work above
shoulder level on the left side.

Second, Plaintiff asserts that the VE's testimony was
erroneous and that, therefore, the ALJ's finding that Plaintiff
is capable of performing his past relevant work as a waiter, a
bartender, and a night clerk/stocker is also in error. See
Plaintiff's Mem. at 16-17. Regarding Plaintiff's work as a
waiter and bartender, the VE testified as follows:

> Q    If the individual is capable of medium exertion,
>      but no repetitive over-head reaching, would it
>      allow for any of the past jobs?
>
> A    Could you repeat the hypothetical once?
>
> Q    Medium --
>
> A    Yeah.
>
> Q    -- with no repetitive over-head reaching on the
>      left side.

\*\*\*\*

Q    No repetitive [] over-head reaching with the left,
     non-dominant hand.  Would that affect — would that
     allow for any of the past work?

A    Yes.

Q    The ones you previously testified to?

A    Yes.  Medium and light.[17]

(R. at 436-37)  The VE subsequently testified:

Q    If the individual were capable of performing at the
     medium exertional level; however, could not engage
     in   repetitive   climbing,   crawling,   stooping,
     kneeling,  or  squatting,  with  no  over-head  --
     repetitive over-head reaching, would that allow for
     any of the past work?

A    It  would,  it  would  allow  for  the  machine
     operator,[18]  it would allow for the parking lot
     attendant and, and was, was the last part of it no
     over-head reaching with --

Q    Repetitive.

A    Repetitive?  With either hand?

Q    Oh.  I'm sorry.  The left non-dominant hand.

A    Okay.  It would allow for the stock clerk.

Q    Would it allow for the bartender or waiter?

A    It would not allow for the bartender and it, it
     would not allow for the waiter only because to get

---

[17] The VE identified Plaintiff's jobs as waiter, restaurant
industry, bartender, restaurant industry, and driver, parking lot
industry, as unskilled light work and his job as a night clerk
stocking shelves, grocery industry, as unskilled medium work.  (R. at
435)

[18] The VE had previously testified that the machine operator
position would be unskilled, light exertional work according to the
DOT.  (R. at 439)

                    the glasses, to get – there's always over-head
                    objects that --

    Q   Okay.

(R. at 440)  Thus, the VE testified both that Plaintiff could
perform his past relevant work as a waiter and bartender and that
he could not do so.  (R. at 437, 440)  While Plaintiff points to
the VE's later testimony, the ALJ apparently relied on the
earlier testimony.  It is important to note that the latter
answer was given in response to a hypothetical which also
included a restriction on repetitive climbing, crawling,
stooping, kneeling, or squatting, as well as repetitive overhead
reaching with the left, non-dominant side.  (R. at 440)  It is
also important to bear in mind that this case was decided at step
four of the sequential evaluation process, at which point it is
Plaintiff's burden to put forth evidence that he cannot perform
his past relevant work.  See Gray, 760 F.2d at 371 (noting that
plaintiff had the opportunity to present evidence relating to the
demands of her past job but did not do so).  He has not done so
with regard to his past work as a waiter and bartender.

    As for Plaintiff's work as a night clerk/stocker, Plaintiff
argues that the VE classified this occupation as unskilled,
medium exertional level work within the grocery industry, but
that the DOT actually classifies the job as semi-skilled and
heavy.  Plaintiff's Mem. at 17; see also (R. at 121).  While the
Court is constrained to agree that the DOT classifies the night
clerk/stocker position as heavy exertional work, on the Work
History Report which Plaintiff completed in conjunction with his
applications for DIB and SSI he indicated that the heaviest
weight lifted was twenty pounds and the most frequent weight
lifted was also twenty pounds, (R. at 88).  This is not
inconsistent with an ability to perform medium work.  See 20
C.F.R. § 404.1567(c) ("Medium work involves lifting no more than

50 pounds at a time with frequent lifting or carrying of objects
weighing up to 25 pounds."). The ALJ found that Plaintiff had
the RFC to perform work at the medium exertional level. (R. at
25-26); see also (R. at 276, 285). Thus, while the ALJ misspoke
when she stated that the VE testified that Plaintiff could return
to his past relevant work as "a night clerk as previously
performed and as generally performed in the national economy,"
(R. at 25), the Court finds such misstatement to be harmless
error as it is well established that "[t]he claimant is the
primary source for vocational documentation, and statements by
the claimant regarding past work are generally sufficient for
determining the skill level[,] exertional demands and
nonexertional demands of such work," SSR 82-62, 1982 WL 31386, at
*3; see also Santiago, 944 F.2d at 5 ("The claimant is the
primary source for vocational documentation ...."); Brown v.
Astrue, Civil Action No. 3:08-CV-0255-D, 2009 WL 64117, at *6
(N.D. Tex. Jan. 12, 2009)("An ALJ may rely on VE testimony that
arguably conflicts with the DOT if there is an adequate basis in
the record for doing so. Here, the description of [the
claimant's] past laundry jobs in her work history report supports
the VE's testimony.")(internal citation omitted). Further, as
previously noted, a claimant will be found to be "not disabled"
when he retains the RFC to perform the actual functional duties
and job duties of a past relevant position or the functional
demands and job duties of the occupation as generally required by
employers throughout the national economy. SSR 82-61, 1982 WL
31387, at *2. Moreover, as was the case in Brown, Plaintiff "did
not cross-examine the VE regarding the putative conflict with the
DOT, even though the VE testified that his conclusions were in
accord with the DOT." 2009 WL 64117, at *6; see also Matta v.
Sec'y of Health & Human Servs., 806 F.2d 287, 290 (1st Cir. 1986)
("Claimant was represented by ... counsel at the hearings.

32

Counsel had the opportunity to present whatever testimony he wished.").

As for Plaintiff's assertion that "it is self-evident that a person who cannot engage in 'repetitive overhead reaching, on the non-dominant side[,] cannot work as a night clerk stocker ...," Plaintiff's Mem. at 17, such assertion falls short of meeting Plaintiff's burden of showing that he was incapable of performing his past work as a night clerk/stocker, see Santiago, 944 F.2d at 5; Gray, 760 F.2d at 372; see also Manso-Pizarro, 76 F.3d at 17. Moreover, the VE testified that this position did not require repetitive overhead reaching with the non-dominant hand.  (R. at 440)  The ALJ was entitled to rely on the VE's testimony in this regard.  See Brown, 2009 WL 64117, at *5 ("In general, a VE's testimony is substantial evidence on which an ALJ may base a finding that the claimant can still perform her past relevant work.").

Lastly, even if the Court were to accept Plaintiff's contention that the ALJ erred in finding that he could return to his past relevant work as a waiter, bartender, or night clerk/stocker, there remains the VE's testimony that Plaintiff could return to his past work as a parking lot driver, (R. at 436-37, 440), and machine operator as described in the DOT, (R. at 440).  Plaintiff makes no argument regarding these positions. See Plaintiff's Mem. at 16-17.

The Court has reviewed the entire record and finds that substantial evidence supports the ALJ's determination that Plaintiff retained the RFC to perform work at the medium exertional level with no repetitive overhead reaching on the left, non-dominant side, (R. at 25), and that his past relevant work did not require the performance of work-related activities precluded by his RFC, (R. at 26).  The VE testified that Plaintiff was able to perform at least some of his past relevant

work.  (R. at 436-40)  The ALJ was entitled to rely on that
testimony.  I therefore find that the ALJ's step four decision
that Plaintiff was capable of performing his past relevant work
is also supported by substantial evidence.  Accordingly, I do not
recommend remand on this claim of error.

### Summary

In summary, the Court finds that the ALJ's step two
determination that Plaintiff did not have a severe mental
impairment before or after his date last insured is supported by
substantial evidence in the record and that her determination
that Plaintiff did not have a severe physical impairment prior to
the expiration of his insured status is also supported by
substantial evidence.  I further find that the ALJ's step four
determination that Plaintiff retained the RFC to perform his past
relevant work is supported by substantial evidence.

### Conclusion

The Court finds that the ALJ's decision that Plaintiff is
not disabled within the meaning of the Act, as amended, is
supported by substantial evidence in the record.  Accordingly, I
recommend that Defendant's Motion to Affirm be granted and that
Plaintiff's Motion to Reverse be denied.

Any objections to this Report and Recommendation must be
specific and must be filed with the Clerk of Court within ten
(10) days of its receipt.  See Fed. R. Civ. P. 72(b); DRI LR Cv
72(d).  Failure to file specific objections in a timely manner
constitutes waiver of the right to review by the district court
and of the right to appeal the district court's decision.  See
United States v. Valencia-Copete, 792 F.2d 4, 6 (1ˢᵗ Cir. 1986);
Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1ˢᵗ
Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
September 30, 2009